Believing no reversible errors are presented, the judgment is affirmed.

### On Appellant's Motion for Rehearing.

DAVIDSON, Judge.

In his motion for rehearing, appellant insists we erred in reaching the conclusions expressed.

No new or different propositions are presented.

The entire record has been re-examined. We remain convinced that reversible error is not reflected. No useful purpose would be served to write further.

The motion for rehearing is overruled.

PER CURIAM.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

**SUTTON et al. v. SHANLEY et al.**

No. 2663.

Court of Civil Appeals of Texas. Waco.

Feb. 7, 1946.

Rehearing Denied Feb. 28, 1946.

568

Greer & Cox, of McAllen, for appellants.

Oxford, Oxford & Ramsour and T. J. Bader, all of Edinburg, for appellees.

LESTER, Chief Justice.

This suit was originally brought by the Security State Bank of Pharr, Texas, as an interpleader against Laura S. Shanley, her husband, J. F. Shanley, and L. M. Sutton as defendants. The court dismissed the interpleader suit but this was reversed by the Fourth Court of Civil Appeals at San Antonio, Texas, 182 S.W.2d 136. Sutton then amended his pleadings and E. V. Springer intervened, and they as plaintiffs sought to recover the title to the land involved by reason of an alleged contract of sale made by the Shanleys to Springer, or, in the alternative, plaintiffs alleged that if for any reason the court should conclude that plaintiffs were not entitled to have said property vested in said plaintiffs, the one or the other of them, then Sutton alleges that he is entitled to recover of the Shanleys a real estate commission of $750 and $75 incurred by him in connection with abstracts. Springer, in the alternative, says he is entitled to recover judgment for the value of the moneys, labor and time expended and incurred by him in connection with his purchase of said property which redounded to the benefit of the Shanleys in the sum of not less than $2000.

The Shanleys pleaded that Mrs. Shanley was a married woman and that the property involved was her separate estate; that there was never any binding contract of sale between the Shanleys and Springer or between the Shanleys and Hall. They also pleaded that there were special circumstances why she wanted to be particular as to who the purchaser was, and such facts had been communicated to Sutton; that she never knew anything about Springer wanting to buy the property until the filing of the amended plea of intervention by him in this case. They also pleaded lack of mutuality, in that there was no contract whatever that either party could enforce.

The case was tried before the court without the aid of a jury. Interpleader's claim was settled by agreement of the parties. The parties also agreed that the court should try the question of the liability of the Shanleys for a commission and the rights of the parties to the land involved. The court, based upon said agreement, severed the issues and tried the issue of liability, leaving the question of accounting to a later date if and when it became important. The trial court found for the defendants, and if there is sufficient testimony to support such finding, its judgment should be upheld. The real or main question in this case, as we see it, is whether or not the Shanleys entered into a valid contract with Springer.

All of the dealings between the parties consist of letters and telegrams that passed

between the Shanleys and Sutton and between the Shanleys and the Bank, some of which will be omitted for the sake of brevity. On January 14, 1943, Sutton sent to Mrs. Shanley a postcard inquiring of her if she wished to sell the land in question, and if so, he would like to have her price. On February 5, 1943, she replied, saying she would be willing to sell the property for $4500 net. Sutton replied to Mrs. Shanley's letter of the 5th but evidently received no reply from her, and wrote her again, telling her that the old people who were living in the house said they had a life lease on the place and would not give it up; that they were old and feeble and he questioned if a court would dispossess them at that time as they claimed the rents, etc., and telling her it would be impossible to sell the place until some kind of a settlement could be made with them. On July 7th Mrs. Shanley wrote Sutton, stating that she had received his letter of June 16th and was sorry that she did not know the condition that existed and that if he had advised her sooner regarding the same, that she might have been· able to have worked out some agreement with them sooner than she could then (referring to the old folks who were her aunt and uncle), as their daughter had moved to Florida. She further said:

"Perhaps a picture of the situation might help us work out something a little easier and together. A number of years ago this couple, who are my aunt and uncle, my aunt being my father's sister, traded some property (a farm) in Ohio for this property in Texas, assuming a mortgage (I think) might have been a trust deed, but they could never pay anything on it, so my father paid it off (as he had helped keep them many years before that.)

"My father passed away in October, 1933, so this property came into his estate. In the division of some of this estate this property came to me, although I did not want it, as it represented a considerable amount of money. There never was any written agreement between my father and aunt and uncle, or between them and my father's children. * * *

"I have been paying taxes for a number of years on this property, even the water bonds, but have not received a cent from it, as anything that is made there my uncle takes. I do not want to put them off the property, but I do feel that now is the time to sell it, and I am too far away from it to want to keep it and run it after my aunt and uncle pass away.

"Do you think any of your interested clients might be willing to buy this property and allow the couple to live in the house? This suggestion was once made by their daughter.

"This couple have four children and my aunt and uncle each receive a pension from the State of Texas.

"I am anxious to dispose of this property and to work out something so would appreciate any suggestion from you.

"Did you have many who were interested in the property and were they willing to pay the price asked? I would appreciate hearing from you at once."

On July 14, 1943, Sutton wrote to Mrs. Shanley as follows:

"I am in receipt of your letter re the place near San Juan and yesterday I was to see your aunt and uncle and had a talk with them re the place. The aunt is in very poor health and do not think she can live long. The old man is spry and ninety and somewhat belligerent. * * * I suggested a settlement with them re their living in the house as long as they lived with about one acre of land. They claimed they could not live on the pension alone and that none of the children was able to help them and that they had to have what income the place made in order to live. * * *

"They suggested that they might be interested in your idea of giving up all but the house * * * if you could give them some kind of a pension. If you would care to do this it would ease things up and you would be ahead in the long run, as you would not have any taxes to pay and would be getting the interest on your money.

"I have a party that has made me a tentative offer of $4000.00 and leave them on the place during their lifetime or until they leave as he does not care for the building at this time. This would have to include my commission of five per cent. If you care to accept this offer, provided we get possession of the land and grove this fall, I can close a sale.

"Please advise by return airmail, and in the meantime I will have another talk with the old people and see what can be done."

On July 20, 1943, Mrs. Shanley replied to Sutton's letter of the 14th, in which she said:

"I appreciate very much your talking over the matter with my uncle. I am interested in the tentative offer made in your letter, but of course do not feel like taking too low an amount. In my letter of February 5, 1943, I had said that I would be willing to sell this property at $4500.00 net. If I took $4000.00 and had to pay your commission of $200.00 besides, that would be $750.00 less than my price, and still less if I pay any money to my aunt and uncle.

"I think I might be willing to compromise and take $4250.00 net for the property, you getting your commission above this in the sale price.

"*Who are the people interested in the place? Will they live up to their contract? What do they do? Are they reliable, etc. What sort of terms could the deal be worked out on?* Would they be willing to pay more, where they receive the house, if my uncle and aunt remained there now, and in case we could work out something with my aunt and uncle to leave the house this fall,` upon delivery of the property would they be willing to pay more for the purchase price? * * * (Italics ours)

"As mentioned in my previous letter there is nothing in writing whereby they are entitled to live there all their lives, *but we do not want to create any hard feelings, so will try to work out something and we do appreciate your cooperation.*" (Italics ours).

On July 31, 1943, Sutton wrote to Mrs. Shanley as follows:

"I have sold the North half of Lot 19, Block 8, as per your letter, which will net you $4250.00 for sale, less the cost of abstract and revenue stamps. I do not know how far your present abstract is continued to but would not anticipate a very large abstract cost. In making the sale I have given Mr. and Mrs. Ferrall a lifetime lease on the slightly over one acre of land where the buildings are and have reserved the landlord's share of the cotton, about five acres, which is being picked. * * * I was also compelled to make the sale subject to the existing agreement Mr. Ferrall has out with one Peter Keiffer in which Mr. Ferrall agreed to give him one-half of the fruit for looking after the grove. * * *

"You will have to pro-rate the taxes to this date for 1943. I have not the amounts but will have them when settlement is made. * * *

"I am enclosing you the lease which I have agreed upon with the Ferralls and you will please sign and return them to me, being sure to have your signature acknowledged there so that the same will be eligible for record here. In this way it clears your title and also assures the old folks of their home. * * * I wish to say I have not obligated you in any promises outside of the lease, merely telling the old folks that you and Mrs. Irvin were working out a plan to see that they were not neglected, so you are perfectly free to act in any way you choose. The Mrs. is very poorly and cannot last very much longer, the old gentleman is spry.

"I have made this sale all cash to you and if you will send me the abstract direct and send the deed which I am enclosing to the Security State Bank at Pharr with instructions to deliver this to me on payment of the sum of $4250.00 net to you, excepting cost of transmitting the money to you, the cost of abstract and recording such papers as are necessary to complete the title, I will take care of it. You will note that I have not completed the deed, not knowing whether or not you are married, and if so, not having the name of the husband, also have omitted the name of the purchaser at their request as they have not decided as to carrying the title. If you will instruct the bank to allow me to complete this deed when the deal is closed so that I can use the same type in filling in the blanks. *Mr. Hall of this place is the buyer. He is reliable and owns other land in the vicinity of this. land and think he will take good care to see that the old folks are not molested.* (Italics ours). I have a deposit up. to cover costs, etc., so that you will be protected in any expense.

"They have asked me to have you wire me on receipt of this if the sale is satisfactory so that they can make their calculations. Then please go before the Notary and execute the deed and send it to the Security State Bank, Pharr, Texas, as above stated. I expect it will take two or three weeks to get it closed up, and if we have to get papers from Kansas, perhaps a little longer."

On September 7, 1943, Sutton wrote Mrs. Shanley, telling her he had been expecting word from her daily and that "the parties that are buying the place are anxious to go to work on it and under the cotton allotment rulings the cotton stalks should be turned under im-

mediately or else they will not be allowed to plant cotton, the other land should be prepared for crops." He further said: "Please wire me on receipt of this letter if you have not already written me, and authorize me to go ahead and let them get to work. I presume you are waiting to hear from the abstracts. If you cannot find them I can have new ones made and get you a special rate so the cost will not be prohibitory."

On September 11th, Mrs. Shanley wired Sutton authority to have the purchaser proceed with plowing. On October 7, 1943, Mrs. Shanley wrote the Security State Bank of Pharr, Texas, as follows:

"I am enclosing warranty deed to be delivered to L. M. Sutton of McAllen, Texas, a real estate dealer, upon receipt of cash for sale of my property in Hidalgo County, Texas, said property being sold to Mr. Hall, the amount of cash to be paid me is $4250.00 net, the cost of the abstract, revenue stamps, recording of papers to complete the title, and transmitting of the money to me being deducted from the above.

"He has requested that I send the enclosed to you and I trust you will take care of this matter legally and do whatever is necessary to protect my interests.

"Will you please note that the deed is not completed. Mr. Sutton had requested that I instruct you to allow him, after you have the money in hand, for the purchase of this property, to type in the deed, using the same typewriter, the name of the purchaser, in the way in which the purchaser wanted to carry the title. Will you also see that the two blank spaces in the deed are filled in with '175 ft.', one hundred and seventy-five feet. If you will note in the deed, the taxes are to be pro-rated as of September 1, 1943.

"I am sending L. M. Sutton a supplemental abstract, prepared by the Valley Abstract Co., Edinburg, Texas, prepared for Brown and Bader, attorneys of Edinburg, Texas, who were the Texas attorneys handling this matter for my father's estate. Am also sending to Mr. Sutton two copies of the lease made with Mr. Ferrall. The above abstract will enable him to draw up the final papers. I trust you will take care of the protection of my interests in this matter and before surrendering the deed, you will have the $4250.00 in your hands to send to me. Thanking you, I am."

On November 29th Sutton wrote Mrs. Shanley as follows:

"We have had quite a lot of trouble in closing the deal or getting it closed but think we have everything ironed out now so that you will have your money this week. The papers that the purchaser is signing had to go to Oklahoma, as we have had to arrange a loan to enable them to buy it as the first party that was putting up the money faded out and we had to arrange to get a loan for part of it. This is now done and we have mailed the papers for signature and they should be back within the next few days and the money is then ready.

"We had some delay in the examination of the title as there was a questionable deed in the title way back that the attorneys refused to pass, we had it up with three of them and they finally dug up an old court decision that cured it or anyway we got it passed but it took some time.

"I have not seen Mr. Ferrall lately as he does not stay at the place and may have gone north as he talked of doing. However, he still has his furniture in the house and appears determined to hold on whether he lives there or not. However, that is a matter for them to decide as I made the sale subject to the lease.

"Thanking you for your patience in the matter, I am,"

On December 5, 1943, Mrs. Shanley sent the following telegram to the Security State Bank:

"Please hold up delivery warranty deed to L. M. Sutton until further word from me Such a long time has elapsed This sent September 22."

On December 13, 1943, A. W. Lewis, Cashier of Security State Bank of Pharr, Texas, wrote Mrs. Shanley as follows:

"Please advise us if you want us to return Warranty Deed to L M Sutton. You wired us December 5th to hold up delivery and we are not certain whether you want us to hold this item for further instructions or to return same to you."

On December 15, 1943, Mrs. Shanley wired L. M. Sutton as follows:

"No word since your letter November 29th Decided deal not going through Cannot hold open longer Have offer to

purchase for immediate cash which want to accept."

and on December 17th Sutton wired Mrs. Shanley:

"Money has been paid in the bank at Pharr and purchaser has been in possession of the land per your authority of Sept. eleventh and has crop planted and settled with caretaker. Wire bank to release deed."

On December 18, 1943, A. W. Lewis, Cashier of Security State Bank, wrote to Mrs. Shanley as follows:

"Substantiating my letter of December 13th and your wire of December 5th, please be advised that Mr. L. M. Sutton has tendered payment to us of $4250.00 less $169.-52 for taxes and abstract bill. We are awaiting your instructions in this matter."

The evidence shows that Mrs. Shanley was interested in the welfare of her aunt and uncle to the extent that she did not want to put them off of the place or do anything to incur hard feelings on their part. As an indication of such interest on her part, when Sutton wrote her that he had a purchaser for $4000.00 who agreed to let the old people stay on the place as long as they lived, she inquired: "Who are the people interested in the place? Will they live up to their contract? What do they do? Are they reliable, etc.?" Sutton answered, saying: "Mr. Hall of this place is the buyer. He is reliable and owns other land in the vicinity of this land and think he will take good care to see that old folks are not molested." On October 7th Mrs. Shanley wrote the bank, saying: "I am enclosing warranty deed to be delivered to L. M. Sutton of McAllen, Texas, a real estate agent, upon receipt of cash for sale of my property in Hidalgo County, Texas, said property being sold to Mr. Hall." The record in this case shows that Mrs. Shanley, when she executed and acknowledged the deed in question and sent it to the bank, thought she was dealing with Hall. She had not offered the property to Springer and did not know him in the transaction at all. Then who could say she would have ever entered into a binding contract with him if she had known he was a prospective purchaser? She made inquiry about Hall before she agreed to sell to him, and she would have had the same right, if she had desired to do so, to investigate Springer and then decide whether or not she would sell to him. This she did not have the opportunity of doing. The first knowledge she had that Hall was not the purchaser was when she received Sutton's letter of November 29th, if this letter was sufficient to convey such knowledge. At that time she had already executed the deed and sent it to the bank, believing that Hall was to be the purchaser in the event the deal went through. She at no time thereafter made any other contract or executed any other deed to anyone. Being a married woman and the property being her separate estate, she could not bind herself until she, joined by her husband, executed a deed, acknowledged it as required by law and delivered the same or placed it beyond her control. This she did not do. Having no contract with Springer, Sutton certainly had no right to substitute him instead of Hall. She had a right to choose her own purchaser. Amer.Jur. Vol. 12, p. 532, sec. 38, says: "An offer can be accepted only by the offeree. To constitute a valid contract, the minds of the parties must have met on the identity of the persons with whom they are dealing. Everyone has a right to select and determine with whom he will contract and another cannot be thrust upon him without consent. It is immaterial whether the offerer had special reasons for contracting with the offeree rather than with someone else. It is said that the consent of all persons having an interest in an option is necessary to its exercise by any one of them." C.J. Vol. 66, p. 521, sec. 58, provides: "As in contracts generally, an offer to sell or purchase realty, made to a particular person, may be accepted only by the person to whom it is made or by such person's duly authorized agent." The case of Cusenbary v. Latimer, 28 Tex.Civ.App. 217, 67 S.W. 187, is a case in which a land agent held a deed of trust against Latimer's land and demanded payment as follows:

"Graham, Texas, 4/5, 1901. Mr. R. Latimer, Tiptonville, Tenn.—Dear Sir: I think I wrote you once before that I did not want to foreclose the deed of trust, and I will now say so again, but will not promise to say so any more. Can't you pay the thing up? How much do you want for a deed to the land, in addition to the note? Yours truly, M. K. Graham."

This letter was followed in a few days by the following letter:

"Graham, Texas, 4/12, 1901. Mr. R. Latimer, Tiptonville, Tenn.—Dear Sir: I can sell your land for four hundred dollars, and, by extending the note I hold for two years, make your part cash to you. Do you want to make this sale allowing me 5% commission on the trade? Please answer promptly. Yours truly, M. K. Graham."

These two letters were answered by appellee as follows:

"Tiptonville, Tenn., April 18, 1901. Mr. M. K. Graham, Graham, Texas—Dear Sir: Received your letter, stating that you could get four hundred dollars for the land, but that don't pay me what the land cost me. But, as I haven't paid you the money on the note, you may take it. Make out the deed, and send to me, and I will sign it. Yours truly, R. Latimer."

Shortly prior to Graham's letter of April 12, 1901, appellant, through Graham as agent, made an offer (in amount not shown) for the land in controversy, and upon receipt of appellee's letter of April 18, 1901, Graham prepared deed from appellee to appellant properly describing the land involved, and sent same to appellee for execution, which, however, appellee declined to execute, and Cusenbary brought suit for specific performance. The court held that the writing failed to constitute such contract on appellee's part with the appellant Cusenbary as could be specifically enforced in behalf of the latter, citing Fry, Spec. Perf., 3rd Ed., sec. 330, where it is said: " 'The contracting parties must appear in the contract, or the memorandum of it, in order to constitute a binding contract; but they may so appear either by name or by description, or by reference sufficient to ascertain their identity. Where the defendant made a written offer to take a lease, beginning 'Sir,' without address, and the plaintiff's agent wrote an acceptance, but there was no document signed by the defendant showing the intended lessee's name, it was held that there was no written contract.' The writings here relied upon by no means comply with this rule. There is no reference, direct or otherwise, to appellant. Appellee's letters to Graham constitute mere written authority by virtue whereof Graham might, in appellee's behalf, have made with appellant a binding contract to sell the land which he now seeks to recover, but the record fails to show that this was done."

Appellant contends that Mrs. Shanley is bound to Springer for the reason she executed the deed and placed it in escrow. What we have heretofore said disposes of this proposition. In order to constitute a legal escrow there must be a valid contract to support it. There being no contract between the Shanleys and Springer, there could be no legal escrow. Smith v. Daniel, Tex.Civ.App., 288 S.W. 528; Schmidt v. Baar, Tex.Civ.App., 283 S.W. 1115; Gholson v. Thompson, Tex.Civ.App., 298 S.W. 318; Neal v. Pickett, Tex.Com.App., 280 S.W. 748; Covert v. Calvert, Tex.Civ.App., 287 S.W. 117; Starkey v. Texas Farm Mortgage Co., Tex.Civ.App., 45 S.W.2d 999.

We have gone into the other assignments of appellants and all are overruled. The judgment of the trial court is therefore affirmed.